UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BRIAN WALTON,	Case No. 22-CV-0050 (PJS/HB)

    Plaintiff,

v.	ORDER

MEDTRONIC USA, INC.,

    Defendant.

    Colin J. Pasterski, Clayton D. Halunen, and Blaine L.M. Balow, HALUNEN LAW, for plaintiff.

    Claire B. Deason, Marko J. Mrkonich, and Daniel A. Bihrle, LITTLER MENDELSON, P.C., for defendant.

Plaintiff Brian Walton alleges that his former employer, defendant Medtronic USA, Inc. ("Medtronic"), discharged him in violation of the Minnesota Human Rights Act ("MHRA") and the Employee Retirement Income Security Act of 1974 ("ERISA"). This matter comes before the Court on Medtronic's motion to dismiss Walton's complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons that follow, the motion is denied as to Walton's MHRA claims and granted as to his ERISA claim.

I.  MHRA CLAIMS

*A.  Standing Versus the Merits*

Medtronic and Walton agree that Walton cannot obtain relief under the MHRA unless he is an "employee" as defined by that statute. *See* Minn. Stat. § 363A.08,

subdiv. 2(2) (". . . it is an unfair employment practice for an employer, because of race, color, . . . sex, . . . or age to . . . discharge an employee . . . ."); Minn. Stat. § 363A.03, subdiv. 15. ("'Employee' means an individual who is employed by an employer and who resides or works in this state."). Medtronic argues that Walton is not an "employee" and therefore his MHRA claims must be dismissed; Walton argues that he is an employee and therefore his MHRA claims must not be dismissed. Both parties characterize this issue as a question of whether Walton has *standing*—that is, as a question of whether this Court has authority under Article III of the United States Constitution to adjudicate Walton's MHRA claims.

That cannot be right, though. The three elements of standing are clearly present: (1) an injury in fact (Walton was fired), (2) causation (the firing is fairly traceable to Medtronic's challenged actions), and (3) redressability (the court can award damages or order Walton's reinstatement). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Walton's claim presents a case or controversy within this Court's Article III jurisdiction.

The parties use the language of standing apparently because that is how most cases have treated the question of whether a person is an "employee" under the MHRA. The Court respectfully disagrees with those cases. As the Supreme Court has repeatedly[1] pointed out, "whether [a plaintiff] falls within the class of plaintiffs whom

---

[1] *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *Davis v. Passman*,
(continued...)

[the legislature] has authorized to sue under [some statute]" is a merits question, not a jurisdictional one. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Some older cases referred to this question as one of "statutory standing," treating it as "effectively jurisdictional." *Id.* at 128 n.4. But the Supreme Court has since eschewed both that label and that analysis. Rather, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Id.* (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)); *see also Meraki Recovery Hous., LLC v. City of Coon Rapids*, No. 20-CV-0203 (PJS/KMM), 2021 WL 5567898, at *4 n.8 (D. Minn. Nov. 29, 2021) ("The Court does not view the question of whether plaintiffs are disabled as a question of standing . . . . Rather, disability is simply one of several elements that plaintiffs must establish to recover under the statutes."). And that rule makes sense. "A contrary rule would mean that every plaintiff who *loses*—even plaintiffs who lose after a jury trial—would not have Article III standing. That obviously is not the law." *Salerno v. Ridgewater Coll.*, No. 06-CV-1717 (PJS/RLE), 2008 WL 509001, at *4 (D. Minn. Feb. 8, 2008).

---

[1](...continued)
442 U.S. 228, 239 n.18 (1979).

For these reasons, the Court treats Medtronic's motion to dismiss the MHRA claims as a motion to dismiss for failure to state a claim under Rule 12(b)(6), and not as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).

### B. Whether Walton Is an "Employee"

The MHRA defines an "employee" as "an individual who is employed by an employer and who resides or works in this state." Minn. Stat. § 363A.03, subdiv. 15. Walton concedes that he did not "reside[] . . . in" Minnesota while employed by Medtronic. ECF No. 20 at 9. The primary dispute, then, is whether Walton "work[ed] in" Minnesota when Medtronic allegedly acted unlawfully.

It is difficult to know what "works in this state" means. The statute itself gives little guidance. The Court has found no state-court opinions addressing the question. And most of the relevant federal cases are unhelpful, either because they provide little analysis or because, when they do provide analysis, they treat the question almost as one of personal jurisdiction rather than as one of statutory interpretation. *See, e.g., Arnold v. Cargill, Inc.*, No. 01-CIV-2086 (DWF/AJB), 2002 WL 1576141, at *4 (D. Minn. July 15, 2002) ("[T]he Court does *not* find, under a due process analysis, sufficient contacts with the state of Minnesota with respect to the individual named Plaintiffs who neither lived nor worked in Minnesota.").

Deciding whether Walton "work[ed]" in Minnesota is difficult without a full record. This case is at the pleadings stage. At this point, the Court can consider only the allegations of Walton's complaint. Walton has alleged that, "[o]n average, and throughout the course of his employment at [Medtronic], [he] traveled to Minnesota for work on a quarterly basis." ECF No. 11 ¶ 10. Treating that allegation as true and drawing all reasonable inferences in Walton's favor, *see Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016), the Court finds that Walton has alleged that, over the course of his 25-year career with Medtronic, he was directed to work in Minnesota about four times every year (for a total of roughly 100 visits). The Court also finds that Walton has alleged that, throughout his long career, there was an ongoing expectation that he would travel to Minnesota every quarter or so to work on behalf of Medtronic. Based on these allegations, the Court finds that Walton has plausibly alleged that he "work[ed] in" Minnesota while he was employed by Medtronic and thus that he was protected by the MHRA.

Of course, Walton's allegations might be refuted by evidence developed during discovery, and the Court might revisit this issue when it has a full record. At this point, however, the Court cannot say that Walton has failed to state claims under the MHRA.

## II. ERISA CLAIM

By contrast, Walton has failed to plead a plausible ERISA claim. Walton alleges that Medtronic violated § 510 of ERISA—which (among other things) prohibits an employer from "interfering with the attainment of any right to which [an employee] may become entitled under [a pension] plan," 29 U.S.C. § 1140—by engaging in a pattern or practice of replacing employees who are entitled to pension benefits with those who are not. But Walton pleads not a single specific fact in support of that allegation.[2] He identifies no earlier reduction-in-force or reorganization, no one who was previously laid off, no one who was previously *not* laid off. All that Walton alleges with any specificity is that he, who participated in a pension plan, was replaced by another employee, who did not. Needless to say, a single instance does not a pattern or practice make. *Cf. Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875–76 (1984) ("Proving isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that bare legal conclusions are "not entitled to the assumption of truth" afforded to factual allegations).

---

[2]The entirety of the relevant allegation is: "Defendant engages in a systemic [sic] pattern and practice of utilizing reductions in force or reorganizations with the specific intent to terminate or replace employees who participate in Defendant's Pension Plan with employees who do not participate or are not able to participate in Defendant's Pension Plan." ECF No. 11 ¶ 28.

Walton also alleges that his firing—in and of itself—violated § 510.[3] He points out that, for every year that he stayed employed while participating in the pension plan, the amount of pension benefits to which he would ultimately be entitled increased. *See* ECF No. 11 ¶ 24. Therefore, says Walton, Medtronic interfered with his right to attain greater pension benefits when it fired him. But what is missing from Walton's complaint is any plausible allegation that, when Medtronic fired Walton, it acted with the specific intent of preventing him from accruing additional pension benefits. *See Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 777 (8th Cir. 2004). Medtronic's mere awareness that Walton would not accrue additional benefits is not enough. *See id.* at 779. Rather, Walton must plausibly allege that "he would not have been terminated had he not been entitled to benefits." *Id.* at 777.

The only facts that Walton pleads relevant to Medtronic's intent is that he was enrolled in the pension plan, he was fired, and he was replaced by someone who was not enrolled in the pension plan. Those facts are *consistent* with the allegation that Medtronic intended to interfere with Walton's pension benefits, but they fall short of making that allegation *plausible*. Given the many reasons why Medtronic—a

---

[3]Walton by turns describes Medtronic's action as discrimination against an employee entitled to benefits under a pension plan and interference with an employee's rights under a pension plan. *See* ECF No. 11 at ¶¶ 78, 84. His claim strikes the Court as more the latter.

multibillion dollar company—might replace Walton, preventing the modest growth of his pension benefits seems like a highly unlikely candidate.

Indeed, in the first paragraph of his complaint, Walton alleges that Medtronic's motivation in replacing him was to increase the diversity of its workforce: "Plaintiff, 56, suffered from age, sex, and race discrimination when he was terminated under the guise of a reorganization and then ultimately replaced by a substantially younger, African-American, female who was less qualified and experienced, in order to satisfy Defendant's internal diversity goals." ECF No. 11 ¶ 1. This allegation—unlike the allegation that he was fired to prevent a small increase in his future pension payments—is supported by specific facts. In fact, Medtronic has not argued that this allegation was inadequately pleaded; it has argued only that Walton was not an "employee" for purposes of the MHRA.

In sum, Walton's factual allegations—that he was enrolled in the pension plan, fired, and replaced by someone who was not enrolled in the pension plan—are "consistent with [an ERISA violation], but just as much in line with a wide swath of rational and competitive business strategy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Accordingly, those allegations "have not nudged [his ERISA claim] across the line from conceivable to plausible." *Id.* at 570; *see also Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint . . . has not '[shown that] the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2))).  Walton's ERISA claim must be dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant's motion to dismiss [ECF No. 13] is GRANTED IN PART and DENIED IN PART.  In particular:

1. The motion is GRANTED with respect to plaintiff's ERISA claim, which is DISMISSED WITHOUT PREJUDICE.

2. The motion is DENIED in all other respects.

Dated:  August 4, 2022            s/Patrick J. Schiltz
Patrick J. Schiltz, Chief Judge
United States District Court